**ARBIE MINERAL FEED CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 20286.

United States Court of Appeals,
Eighth Circuit.

Feb. 26, 1971.

Allen E. Brennecke, Arley J. Wilson, Mote, Wilson & Welp, Marshalltown, Iowa, for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Jack H. Weiner, Herman M. Levy, Corinna Lothar Metcalf, Attys., N. L. R. B., for respondent.

Before MATTHES, Chief Judge, and LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

This controversy arises out of an attempt by the union [1] to organize approximately 24 production and maintenance employees and truck drivers of the Arbie Mineral Feed Co. (Arbie), which engages in the production of animal feed in Marshalltown, Iowa. The union, which claimed to represent a majority of the employees as of January 17, 1969, filed unfair labor practice charges against the employer. The Board determined that Arbie had violated § 8(a) (1) of the National Labor Relations Act by interrogating its employees concerning their union activity and in threatening some employees with economic reprisals should the union win recognition. In addition, the Board found Arbie in violation of § 8(a) (1) and (3) of the Act because of its discharge of two employees. The Board directed that Arbie cease and desist from these unfair labor practices, that it reinstate the men wrongfully discharged and that it bargain with the union. The employer petitions to set aside the Board's order which is reported at 182 N.L.R.B. No. 24, 74 L.R.R.M. 1062 (1970). The Board cross-applies for enforcement. We have jurisdiction pursuant to 29 U.S.C. § 160(e) and (f).

We grant enforcement in part. We decline to sustain the Board's bargaining order. Since the Board's findings of independent unfair labor practices underlie the issuance of said order, we first must review briefly the evidence cited to support these findings.

The union organization drive was initiated in early November, 1968, by Gerald Breuklander, an Arbie truck driver, who was later discharged. Charles Wogan, a plant employee also later discharged by Arbie, joined Breuklander's efforts and signed a union authorization card at the beginning of the campaign. Although other employees hesitated to join the union at first, a number joined the union campaign during or immediately following the union meetings held in December, 1968, and January, 1969. Brueklander successfully solicited union authorization cards from several employees at places away from the union hall. By mid-January, the union possessed fourteen cards and claimed to represent the majority of the employees appropriate to a bargaining unit. Arbie, however, rejected the union's demand for recognition and told the union representative to present the demand to the National Labor Relations Board. Thereafter, the union petitioned for an election, but just prior to the hearing on the petition, filed the instant unfair labor practice charges. On the basis of this filing, the contemplated representation hearing was indefinitely postponed. We turn to a discussion of the separate charges.

I. THE § 8(a) (1) CHARGES

Shortly after the initial union meeting, supervisor Penrod asked Wogan if he was a union member. A few days later, foreman Moore asked Wogan what had transpired at the union meeting. During this conversation, and on subsequent occasions, Moore told employees that the union would not do the men any good, that it would cause employees a loss of money through loss of overtime work, Christmas bonuses and profit sharing, and that those employees campaigning for the union could be discharged. Supervisor Penrod told another employee that if the union gained recognition, Arbie would reduce overtime work for the present employees by adding a third shift. The witness to this latter conversation could not recall the exact date, but he thought the conversation occurred "around" mid-January. The Board deemed these conversations to be coercive and violative of § 8(a) (1). It rejected a number of other § 8(a) (1) charges alleged in the complaint.

Arbie argues that the evidence demonstrates that the conversations consisted of casual, isolated remarks which lacked any coercive effect. It further contends

1. General Drivers and Helpers Local Union No. 790, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

that the employees initiated all conversations with foreman Moore, a former union member, to solicit his personal opinion concerning the benefits of unionism. The record contains substantial evidence, however, to justify a finding of coercion from the repeated and pointed nature of the interrogations; that the remarks were not isolated and inconsequential. N. L. R. B. v. Talbot-General Wire Products, Inc., 419 F.2d 824 (8th Cir. 1969), is easily distinguishable, as in that case the remarks were made in a "casual" conversation.

Our review of questions of fact such as these is limited to whether substantial evidence on the record as a whole supports the Board's determinations. The Board may draw reasonable and fair inferences from the evidence it finds to be creditable. Petitioner has shown no grounds on which we could properly reject the Board's findings and interpretations of the facts relative to these § 8(a) (1) charges.

## II. THE § 8(a) (3) CHARGES

█ On December 5, 1968, Arbie discharged Charles Wogan, an employee of sixteen-months duration, for alleged insubordination. The company contends that it based the discharge on four incidents involving Wogan. The first was the taking of a company truck without permission for personal use. Second, when Wogan was asked to pay for use of the employer's truck, he complained to fellow workers that the company overcharged him. While in the company offices, he said that he "wouldn't take the damn thing again anyway." Third, Wogan improperly operated a mixing machine and burned out its motor. Finally, on the day of his discharge, Wogan protested to the company comptroller that he had been paid $1.00 less than his fellow employees for the previous pay period. The company official rejected his claims. As Wogan left the company offices, he said to a group of fellow employees then waiting in the reception area, "I think it is a bunch of crap." He made this remark in the presence of the female office secretary. Almost immediately thereafter, the manager called Wogan into his office and discharged him because of his "language" and his "poor attitude".

The Board viewed the employer's reasons given for the discharge as pretextual and, in doing so, noted that the alleged misdeeds committed prior to December 5, 1968, produced no hint of disciplinary action by the employer. The Board characterized the incident on the day of Wogan's discharge as being relatively innocuous. From all of the evidence, we think the Board might infer that an intent to discourage union activity, at least in part, motivated this particular discharge. See Betts Baking Co. v. N. L. R. B., 380 F.2d 199 (10th Cir. 1967). Thus, the General Counsel proved Wogan's discharge constituted a somewhat typical § 8(a) (3) violation.

█ The other discharged employee, Gerald Breuklander, had worked for Arbie for more than two years. The company dismissed him for drinking beer while operating a company truck on a feed delivery. A well-established company rule prohibited driving while drinking any intoxicant. Upon being informed of this incident the day after it occurred, the plant manager promptly fired Breuklander. When first confronted by his employer, Breuklander denied the charge. During the interrogation concerning this incident, Breuklander asked for a transfer to a non-driving job in the plant. After considering the matter for a few minutes, the manager declined, even though he later admitted that it was a poor time to let anyone go and that Breuklander had been a good employee.

The Board sustained a § 8(a) (3) violation based on Breuklander's discharge. We disagree. Safety rule "violations present matters which employers may reasonably consider" in determining the appropriateness of a discharge, even if an adherent of the union is involved. Illinois Ruan Transport Corporation v. N. L. R. B., 404 F.2d 274, 279 (8th Cir.

1968). Nor does union affiliation prevent a discharge for cause. N. L. R. B. v. Arkansas Grain Corporation, 392 F.2d 161 (8th Cir. 1968). Breuklander committed a grave dereliction of duty. By driving while drinking, he violated an elemental safety rule which exposed his employer to almost certain liability should an accident occur. We find no substantial evidence indicating that the company condoned such grossly improper conduct by any of its employees at any time. Neither do we find substantial evidence to support the Board's view that Arbie's failure to give Breuklander a different job indicated that the drinking incident constituted a pretextual reason offered by the company for firing Breuklander. Accordingly, we reject the § 8 (a) (3) violation found on these facts.

### III. THE § 8(a) (5) BARGAINING ORDER

██ We must examine the Board's bargaining order by applying the standards for the less extraordinary unfair labor practice case, as set forth in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In Gissel, the Court noted that conduct in the "exceptional" cases, those where the employer's conduct can be characterized as "outrageous" and "pervasive", will justify the issuance of a bargaining order without need of inquiry into whether the union ever represented a majority of the employees. The issuance of such an order is justified in those situations as "the only available, effective remedy for substantial unfair labor practices." 395 U.S. at 614, 89 S.Ct. at 1940. The Supreme Court, in Gissel, also authorized the issuance of a bargaining order by the Board where the employer's independent unfair labor practices, although not subject to characterization as outrageous or extraordinary, "have the tendency to undermine majority strength and impede the election processes." 395 U.S. at 614, 89 S.Ct. at 1940. Conversely, minor unfair labor practices, producing "minimal impact on the election machinery, will not sustain a bargaining

order." 395 U.S. at 615, 89 S.Ct. at 1940. This court recently construed these facets of Gissel, concluding:

> Gissel does not mean that the Board may require a bargaining order in every unfair practice case or that a court of appeals may not review an order where abuse of discretion is alleged. Where there exists little or no opportunity for the unfair practice charge to have a pervasive adverse influence upon the employees' sentiment in an election the Board should still revert to the traditional means of democratic ballot. [N. L. R. B. v. Regal Aluminum, Inc., 436 F.2d 525, 529 (8th Cir., 1971)]

We find adequate evidence to support the Board's view that the union represented a majority of the appropriate bargaining unit here as of the time the union demanded recognition. The Board's conclusion on this point satisfies a preliminary element for the issuance of a bargaining order, proof that the union at one point represented a majority of the employees.

In this case, not marked by any outrageous employer conduct, we must determine whether, under the Gissel rules, Arbie's conduct exerted "minimal impact on the election machinery", which would obviate the need for a bargaining order, or tended to "undermine majority strength and impede the election processes", a circumstance entitling us to uphold the Board's issuance of the bargaining order. To draw the line between these two propositions is extremely difficult particularly upon appellate review conducted in the sterile atmosphere of a printed record. The Gissel decision offers the following guideline:

> It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and ex-

pertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. [395 U.S. at 612, n. 32, 89 S.Ct. at 1939]

The Court in *Gissel*, instructed that the Board issue a bargaining order if it finds "that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order * * *." 395 U.S. at 614–615, 89 S.Ct. at 1940. We have applied this admonition in N. L. R. B. v. Hart Beverage Co., 414 F.2d 618, 621 (8th Cir. 1969). The Board's determinations in this area are, however, subject to judicial review and modification in appropriate cases. N. L. R. B. v. General Stencils, Inc., 438 F.2d 894, 76 L.R.R.M. 2288 (2d Cir. 1971); L. C. Cassidy & Son, Inc. v. N. L. R. B., 415 F.2d 1358, 1365 (7th Cir. 1969).

Significantly, the record in this case discloses that the employer's conduct constituting § 8(a) (1) violations occurred prior to Wogan's discharge on December 5, 1968, except perhaps for supervisor Penrod's second conversation to which we have already made reference. Parenthetically, we note Breuklander's valid discharge occurred in late January, 1969, subsequent to the union's obtaining authorization cards from a majority of the employees. The union obtained eleven of its fourteen signed authorization cards after, not before, December 5. This evidence thus affirmatively indicates that the unfair practices did not tend to undermine a union majority; in fact, the unfair practices preceded the union's most successful card signing period. Cf. Fremont Newspapers, Inc. v. N. L. R. B., 436 F.2d 665 (8th Cir. 1970); N. L. R. B. v. Crystal Tire Company, 410 F.2d 916 (8th Cir. 1969). Although *Crystal Tire* was decided before *Gissel*, that decision conforms with the teachings of *Gissel*. In declining to enforce the Board's bargaining order in *Crystal Tire*, we emphasized that the unfair labor practices did not in fact undermine the employees' adherence to their union, but the employer's unfair labor practice tactics "actually stiffened employee resistance to the short-lived anti-union campaign." 410 F.2d at 920.

In *Fremont Newspapers*, we again refused to enforce a bargaining order. There, the union and the employer had unsuccessfully negotiated for a union contract for a period of approximately ten months. The union contended that unfair labor practices committed by the employer encouraged employees to file a decertification petition to repudiate their union. The Board justified the bargaining order as an appropriate remedy to overcome the effects of conversations between a supervisor and two employees, each on a separate occasion. Judge Hunter, speaking for the court, said:

> Only one of those conversations occurred prior to the Company's refusal to bargain and the filing of the informal decertification petition by the employees. The representations of [employer] were never repeated to other employees * * *. Following the conversations, both employees remained strong Union adherents and took no part in the later filing of the formal decertification petition. [*Fremont Newspapers, Inc., supra*, 436 F.2d at 673.]

The court concluded:

> Therefore in the light of the objective evidence of the record, it is not reasonably possible to find that the independent unfair labor practices here had any effect upon the Union majority or the potential decertification proceedings. [Id. at 673.]

In cases subsequent to *Gissel*, we have frequently approved bargaining orders where, unlike the present case, the record affirmatively disclosed the employer's independent unfair labor practices actually eroded a union majority. N. L. R. B. v. Arrow Specialties, Inc., 437 F.2d 522 (8th Cir. 1971); Howard Mfg. Co., Inc. v. N. L. R. B., 436 F.2d 581 (8th Cir. 1971); Regal Aluminum, Inc., *supra*,

436 F.2d 525; Ace-Alkire Freight Lines, Inc. v. N. L. R. B., 431 F.2d 280, 284 (8th Cir. 1970); Hy-Vee Food Stores, Inc. v. N. L. R. B., 426 F.2d 763 (8th Cir.), cert. denied, 400 U.S. 879, 91 S.Ct. 120, 27 L.Ed.2d 116 (1970).

In other cases, although the record showed no affirmative unhinging of support for the union by employees of the affected company, we enforced bargaining orders resting solely upon one or more § 8(a) (1) violations, and, in so doing, permitted the Board to infer that the particular unfair labor practices tended to "undermine the majority strength and impede the election process." N. L. R. B. v. Noll Motors, Inc., 433 F.2d 853 (8th Cir. 1970). See N. L. R. B. v. Gerbes Super Markets, Inc. (§§ 8(a) (1) and 8(a) (3) violations), 436 F.2d 19 (8th Cir. 1971).

Upon analysis, it appears that we have applied these guidelines of evaluation of evidence in our post-*Gissel* cases in determining whether or not to enforce the Board's bargaining order as a remedy for independent unfair labor practices:

(1) Where the underlying facts affirmatively show that the unfair labor practices have in fact undermined a union majority, typically evidenced by the union losing an election or the employees seeking to withdraw from the union following the occurrence of the conduct in question, we grant enforcement;

(2) Where the record is silent concerning the actual impact of the employer's unfair labor practices, we defer to the Board's exercise of discretion and grant enforcement; and

(3) Where the evidence establishes that the unfair labor practices produced little or no impact upon the employees' allegiance to the union, we deny enforcement.

The present case falls within the above third category of post-*Gissel* cases, since the evidence affirmatively showed that the company's unfair labor practices did not pollute the election atmosphere. See N. L. R. B. v. American Cable Systems, Inc., 427 F.2d 446, 448 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). Here, the organization drive proceeded at an accelerated pace following the employer's commission of prohibited practices. In summary, we think the Board abused its prerogatives in this case by issuing a bargaining order and aborting an election.

Subject to modification as required by this opinion, we grant enforcement of the Board's order herein.[2]

2. Petitioner Arbie shall be entitled to 75 per cent of its taxable costs pursuant to Fed.R.App. P. Rule 39(a).