**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DIXISTEEL BUILDINGS, INC., Respondent.**

No. 71–1053.

United States Court of Appeals, Eighth Circuit.

July 26, 1971.

William R. Stewart, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William F. Wachter, Atty., N. L. R. B. for petitioner.

William W. Alexander, Jr., Fisher & Phillips, Atlanta, Ga., for respondent.

Before LAY, HEANEY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

The National Labor Relations Board determined that the respondent-employer, Dixisteel Buildings, Inc. (Dixisteel), had committed unfair labor practices in violation of §§ 8(a) (1), 8(a) (3), and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), 158(a) (3), and 158(a) (5). The Board issued a cease and desist order against the commission of additional unfair labor practices and required the company to reimburse one employee for lost wages suffered from an unlawful suspension. In addition, the Board set aside a representation election which favored the employer and ordered the employer to bargain [1] with the Union, Sheet Metal Workers International Association, AFL-CIO. The Board here petitions for enforcement of its order, which, along with the Board's decision in this case, is reported at 186 NLRB No. 25; 76 LRRM 1855 (1970). Pending this appeal, the Board, on March 8, 1971, sought interim enforcement of the bargaining order pursuant to § 10(e) of the Act, 29 U.S.C. § 160(e), urging that without interim relief in this case any ultimate remedy would prove ineffective. We deferred any action on this request pending a hearing on the merits. In order that we might expedite our consideration and disposition of this case, the parties were ordered to accelerate the submission of the record and briefs. In the light of our expedited hearing and disposition, we find it unnecessary to determine the merits of the Board's application for such interim relief. We grant enforcement of the Board's order.

A brief review of the facts reveals that Dixisteel engages in the manufacture and distribution of prefabricated buildings at its plant located in Hannibal, Missouri. In late 1968, the Ironworkers Union unsuccessfully sought to organize the employees at that plant. A similar attempt by the Steelworkers Union in early 1969

---

1. As a basis for this remedy, the Trial Examiner, in an opinion which the Board approved, said in part:

> The total restraining and coercive effect on the employees of Respondent's "independent" violations of Section 8(a) (1)—27 of 36, involving 13 of 18 separate incidents, occurring in the critical 2-month period between the Union's recognitional request (July 3) and the Board's election (September 9)—and the powerfully restraining and coercive impace [sic] of Respondent's unlawful discriminatory suspension action against Union employee "spearhead" Rouse on the very day after his return from the Board Representation case hearing in St. Louis (August 7), should not be minimized. (Footnote omitted.)

proved equally fruitless. Also in 1969, the Sheet Metal Workers International Association attempted to organize the plant production workers, and the instant controversy arose during the course of that organizational drive. The Union's drive commenced in late April.[2] By July 3, forty-five employees had executed cards authorizing Union representation. On that date, the Union, claiming to represent a majority of the production and maintenance employees at the Hannibal plant, demanded recognition from Dixisteel. Dixisteel declined recognition, stating that it doubted that the Union represented "an uncoerced majority" of employees in any appropriate unit. Contemporaneously with its demand for recognition, the Union also petitioned for a representation election. This election was held on September 9, and the Union lost by a vote of forty-one to twenty-nine.

The record discloses strong company resistance to the Union's organizational drive. The Union charged that this resistance included the commission of unfair labor practices by the employer. The Union also filed objections to the representation election. All charges were consolidated for hearing before a Trial Examiner. The Trial Examiner sustained some, but not all, of the unfair labor practice charges, and recommended the issuance of a cease and desist order against the employer, as well as the reinstatement of status and back pay of an employee who had been unlawfully suspended for three days. In adopting the Trial Examiner's recommendations, the Board sustained the Union's objection to the representation election and directed that a bargaining order issue.

In resisting the instant petition for enforcement of the Board's order, respondent Dixisteel contends that: (1) several conversations between supervisors and employees constituted, at best, only uncoercive interrogations which did not violate § 8(a) (1) of the Act; (2) no violation should be charged against the company for allegedly coercive interrogations arising out of conversations between a salesman and production employees, since that salesman should not be considered either as a supervisor or one otherwise authorized to speak on labor matters for the employer; (3) the employer's extensive speech-making and letter-writing to Dixisteel employees fell within the ambit of the "free speech" protection of § 8(c) of the Act (29 U. S.C. § 158(c)); (4) no basis existed for finding an 8(a) (5) violation since the Union did not in fact represent a majority of the employees in the bargaining unit, several of them having signed cards through mistake induced by misrepresentations of the facts by Union representatives; and (5) the evidence produced at the administrative hearing afforded no basis to support a bargaining order, since the conduct, even if determined to constitute unfair labor practices, produced little or no impact upon the employees' allegiance to the Union.

We find it unnecessary to review the details concerning the bulk of the § 8(a) (1) violations and the suspension of one of the employees who served as a leader in the Union organizational effort. Our review of the record convinces us that it contains substantial evidence which supports the Board's determination. *See* Mid-South Towing Co. v. NLRB, 436 F. 2d 393, 394 (8th Cir., 1971); *cf.* 8th Cir. R. 14(3) (effective May 1, 1971). We also find substantial evidence supporting the validity of the Union authorization cards placed in question by the employer.

We next turn to the "free speech" issue and the employer's contention that speeches and letters of plant manager Ralph Gross, directed to Dixisteel's employees, should not be deemed an unfair labor practice. Section 8(c) of the Act, as pertinent, provides as follows:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair la-

2. All events relevant to this controversy occurred in 1969.

bor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit. [29 U.S.C. § 158(c)]

Gross's speeches of March 28, May 21, and September 8, as well as his letter to employees dated June 26, present a recurrent theme typified by the following excerpts:

> A Union will not benefit the employees here in Hannibal. You men have a wage and benefit package that is equal to and sometimes exceeds the contract negotiated by the Steelworkers in Tallapoosa [Georgia]. The Steelworkers have this contract in a plant which produces a product identical to the buildings we manufacture here. You have the same deal without paying Union dues and if Tallapoosa receives any wage or benefit increase you will receive the same or more. [March 28, during Steelworkers Union organizational campaign]

---

> You know the Steelworkers have a contract with the Plant in Tallapoosa. You also know that you receive all of the benefits of the contract without having to pay Union dues. We have promised you before, and I want to repeat, that whatever increase in benefits or wages that are [sic] granted under the Union Contract, will be installed here for you.
>
> \* \* \* \* \* \*
>
> \* \* \* Get the Union organizer to give you a *written guarantee* that you will get a better deal before you sign a card. I've got news for you—he won't give it to you simply because he can't guarantee anything except that they will collect dues from you. You know that you have a *guarantee* from the Company that you will get whatever is negotiated with the Steelworkers Union for employees in Tallapoosa.[3] [May 21, during Sheet Metal

Workers campaign] [Emphasis from original]

---

> \* \* \* [W]e do work men out of position. We do this for your benefit, so that we don't have to lay you off. Have we ever had a shutdown, or lay-off here? The answer is *NO*, but under our union contract we have.
>
> \* \* \* \* \* \*
>
> Lastly, when this union asks you to put your name in writing ask them to guarantee their promises in writing. That is only fair. They won't because nothing is automatic if you get a union. The company has the right to negotiate wages, and anything it wants just like the union does. Long negotiations can mean strikes. A six month strike was just recently ended with the parent company. Who can afford to be out of work for *6* months? [Letter to employees of June 26, 1969] [Emphasis from original]

---

> Unfortunately, negotiations can mean strikes. In fact the Sheet Metal Workers in Kansas City just finished a 90-day strike and I have known strikes to last as long as three years.
>
> \* \* \* \* \* \*
>
> \* \* \* I just want you to consider the facts and not promises. I think if you consider all the facts you'll vote for the Company and not the Union, and its false promises. [Speech delivered to employees on September 8, 1969]

The Supreme Court has made it clear that § 8(c) "implements the First Amendment." NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In that case, the Court opined:

> Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights

---

3. This speech also made specific reference to the earlier one of March 28, 1969.

of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a) (1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. [395 U.S. at 617, 89 S.Ct. at 1942]

■ Tested by these standards, the employer's words here, implicitly, as well as explicitly, may be taken to convey a message that the employer promises or guarantees (as contrasted with the empty promises of the Union) that employees at Hannibal will receive the same or even greater benefits than those negotiated by the Union at Tallapoosa; that Hannibal employees will not sustain any lay-offs, all without incurring any expense of Union dues, provided only that they reject the Union. As an alternative, the employer, with little subtlety, raises the spector of strikes, lay-offs, and shutdowns. Viewing these employer-employee communications as a whole within the context of a labor relations setting, as we are required to do, *Gissel, supra,* at 617, 89 S.Ct. 1918; NLRB v. Hawthorn Co., 404 F.2d 1205, 1212 (8th Cir. 1969), we hold that substantial evidence supports the Board's determination that these communications violated § 8(a) (1) and fall within the "threat of reprisal * * * promise of benefit" clause of § 8(c). See NLRB v. Douglas & Lomason Co., 443 F.2d 291 (8th Cir., 1971); NLRB v. Louisiana Manufacturing Co., 374 F.2d 696, 702–703 (8th Cir. 1967); Surprenant Manufacturing Co. v. NLRB, 341 F.2d 756, 760 (6th Cir. 1965).

The employer's reliance upon Central Hardware Co. v. NLRB, 439 F.2d 1321 (8th Cir. 1971), and NLRB v. Herman Wilson Lumber Co., 355 F.2d 426 (8th Cir. 1966), will not support the setting aside of the Board's finding on this issue.

The evidence in those cases disclosed no similar "carrot and stick" approach as was here utilized by the management of the Hannibal branch of Dixisteel.

We next turn to respondent's objection to the bargaining order. We, of course, recognize that a bargaining order represents a strong purgative for the employer. The Trial Examiner and the Board justified this order as an appropriate remedy for the employer's extensive and pervasive violations of the Act, see n.1, *supra.* The Trial Examiner also noted:

In this case, the quantitative massiveness and the qualitative nature of the unfair labor practices committed by Respondent, reflected against the spectrum of the small community, observed factory worker level, and time factors involved, persuade me that Respondent's violations would tend to leave lasting scars with lingering coercive effects upon the employees; and that they are in the aggregate of so substantial a nature as to preclude the holding of a fair and free election in the reasonably foreseeable future. I find that under the circumstances shown there is "insufficient indication that a * * * [rerun] election [sic] * would definitely be a more reliable test of the employees' desires than the card count taken before the unfair labor practices occurred." NLRB v. Gissel Packing Co., 395 U.S. 575, 616, 89 S.Ct. 1918, 1941, 23 L.Ed. 2d 547.

In arguing the inappropriateness of this remedy, Dixisteel insists that a reading of the record establishes that its conduct did not in fact materially interfere with the Union organizational drive. It points out that the Union attained a majority by July 3, notwithstanding its antiunion activities, even if those be deemed unfair labor practices. It also asserts that the evidence shows that the Union lost its majority because of employee turnover in the plant, rather than because of unfair labor practices. The

---

* This quotation alters the language of the *Gissel* opinion slightly, but accurately conveys its meaning.

hearing record shows that the Union lost its "card-signing majority" of forty-five out of eighty-three unit employees by four "signed-up" employees leaving the work force as of July 17. The Union regained its majority through the signing of additional employees by July 31. Employee turnover again caused the Union to lose that "card-signing majority" a few days later. From this evidence, Dixisteel asserts that its conduct neither hampered organizational efforts nor eroded the adherence of a majority of the employees to the Union. On this evidence Dixisteel concludes that changes in employee personnel alone caused the Union to lose the election.

We disagree. Dixisteel's argument adopts the assumption that those who have not signed Union cards will not vote for the Union regardless of the company's unlawful anti-union conduct. We consider such an assumption purely fanciful. Although employee turnover may have contributed to the Union losing the card-signing majority as well as the representation election, the appropriateness of the bargaining order rests upon whether the unfair labor practices tended "to *undermine* majority strength and *impede* the election processes." *Gissel, supra,* 395 U.S. at 614, 89 S.Ct. at 1940 (Emphasis added.) Dixisteel's argument misses the point. The Union established that it had the support of the majority of the employees as of July 3. In order to justify a bargaining order in the situation where the employer's unfair practices have not been egregious, the record need show that the Union held a majority at one point, not that the Union held a majority according to signed cards up to the time of the election. A bargaining order serves two purposes: it may better protect the majority employee sentiment as reflected, at one time, through signed authorization cards, and its issuance may serve as a deterrent to future misbehavior on the part of the employer. *Gissel, supra,* 395 U.S. at 614,

89 S.Ct. 1918. Employee turnover, while a relevant consideration for the Board in determining the propriety of its remedy, cannot be deemed dispositive in a case of this kind. It seems obvious that employer coercion manifested by unfair labor practices may affect the card-signing campaign as well as the employees' free choice in casting ballots at the election. Since plant personnel invariably change with the passing of time, placing undue emphasis upon the loss of majority due to employee turnover tends to reward, rather than deter, an employer guilty of unfair labor practices during the organizational campaign preceding the representation election. *Cf.* NLRB v. DITMCO, Inc., 428 F.2d 775, 781 (8th Cir. 1970).

Considering the number of unfair labor practices in the instant case, and their generally pervasive nature as determined by the Trial Examiner and approved by the Board, we hold that the Board properly exercised its discretion in ordering the employer to bargain with the Union. We have sustained the issuance of bargaining orders by the Board in less compelling cases. We summarized the holdings of our earlier cases on this subject in Arbie Mineral Feed Co. v. NLRB, 438 F.2d 940 (8th Cir. 1971), where we said:

(1) Where the underlying facts affirmatively show that the unfair labor practices have in fact undermined a union majority, typically evidenced by the union losing an election or the employees seeking to withdraw from the union following the occurrence of the conduct in question, we grant enforcement;

(2) Where the record is silent concerning the actual impact of the employer's unfair labor practices, we defer to the Board's exercise of discretion and grant enforcement; and

(3) Where the evidence establishes that the unfair labor practices produced little or no impact upon the em-

ployees' allegiance to the union, we deny enforcement. [438 F.2d at 945] [4]

While we cannot say, because of the impact of employee turnover, that the unfair labor practices in this case definitely undermined the union majority, we think it clear that the evidence permitted the Board, in its discretion, to infer that the particular unfair labor practices here tended to undermine the majority strength and impede the election processes.

The Board's order is enforced.

4. For a post-*Arbie* case which a panel of this court found to be within the third category, see NLRB v. Hart Beverage Co., 445 F.2d 415 (8th Cir. 1971).