NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ANVIL PRODUCTS, INC., Respondent.

No. 73-3527.

United States Court of Appeals,
Fifth Circuit.

June 26, 1974.

Elliott Moore, Deputy Assoc. Gen. Counsel, Robert A. Giannasi, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., W. Edwin Youngblood, Director, Region 16, N. L. R. B., Fort Worth, Tex., for petitioner.

J. D. McLaughlin, Paris, Tex., for respondent.

Before BELL, SIMPSON and IN-GRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

The National Labor Relations Board is here pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), seeking to enforce its order, 205 N.L.R.B. No. 80, against Anvil Products, Inc. We find substantial evidence in the record to support the board's conclusion that the company violated § 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by refusing to reinstate one economic striker and by refusing to restore pre-strike seniority to two reinstated economic strikers. With regard to the § 8(a)(5) violation, 29 U.S.C. § 158(a)(5), arising from the company's refusal to bargain with the union[1] on the basis that it no longer represented a majority of the unit employees, the record is inadequate to support the board's issuance of a bargaining order; we, therefore, remand this portion of the case for additional proceedings before the board.

## I.

The facts underlying this dispute are not complicated. The relationship between the union and the company began on May 28, 1971, when the union was certified, following a board supervised election, as the representative of the company's production and maintenance employees. Shortly thereafter negotiations began for the first contract. Although negotiations continued until January 24, 1972, they proved fruitless, and on this date the union voted to strike in support of its economic demands. The strike lasted until February 3rd when the union notified the company that the strike had ended and that all striking employees would return to work unconditionally on February 7th.

The § 8(a)(3) violations arise from the company's treatment of three strikers. Two employees, Craver and Stephens, were replaced during the strike. Both were rehired on February 15th as new employees, meaning that they lost their pre-strike seniority. The third employee, Tolbert, was also replaced during the strike, but he has not been reinstated, the company arguing that it has no duty to offer to rehire Tolbert because he quit voluntarily on February 3rd. Tolbert's version of the story was that he did not quit, but was terminated by Schurr, the company's general manager, when he went to the plant to inquire about reinstatement. Crediting Tolbert, the administrative law judge ordered that he be reinstated and that the company must restore pre-strike seniority to Craver and Stephens.

After the end of the strike and the return to work of the striking employees, another bargaining session was held on February 11, but the parties suspended negotiations after this meeting. Nothing significant occurred until the latter part of April when employee Louise Boulton began circulating a petition in an effort to have the union decertified.[2] The company neither instigated nor participated in the circulation of the petition, but Schurr knew that such a move was being made and was subsequently told by Boulton that a substantial number of employees had signed the petition. This petition, seeking a decertification election, was filed with the board's regional office on May 30. Before a hearing could be held on this petition the union filed unfair labor practice charges founded on the company's treatment of the strikers. The charges were filed on June 6, the same day that the union requested another bargaining session with the company. Believing that the union no longer represented a majority of the unit employees, the company refused to resume negotiations. The union thereafter amended its unfair labor practice charges to include this refusal to bargain. In line with the board's blocking charge practice, the decertification election petition was dismissed without consideration as a result of the pending unfair labor practice charges.

---

1. Local Lodge 1923, International Ass'n of Machinists & Aerospace Workers, AFL–CIO.

2. 29 U.S.C. § 159(c)(1)(A)(ii).

The administrative law judge found that the company had violated § 8(a)(5) by refusing to bargain and withdrawing recognition from the union on June 14. The judge ruled that the company failed to rebut the presumption of the union's continuing majority status and that the company's independent unfair labor practices, the discrimination against the three strikers, precluded a finding that the company's withdrawal of recognition was based on a good faith doubt of the union's majority status. To remedy the § 8(a)(5) violation the company was ordered to bargain with the union on request.

The board adopted the administrative law judge's decision and order, but the basis for its action differed in one significant respect, which will be discussed in part III. Board member Kennedy dissented from the board's decision to affirm the § 8(a)(5) violation.

## II.

■ There is substantial evidence on the record as a whole, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), to support the board's conclusion that the company violated § 8(a)(3) and (1) of the Act by depriving Craver and Stephens of their pre-strike seniority and by not offering reinstatement to Tolbert. *See* C. H. Guenther & Son, Inc. v. NLRB, 427 F.2d 983, 985 (5th Cir., 1970); American Machinery Corp. v. NLRB, 424 F.2d 1321, 1324–1328 (5th Cir. 1970); Laidlaw Corp. v. NLRB, 414 F.2d 99, 103– 105 (7th Cir., 1969), cert. den. 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100. *See also* NLRB v. Fleetwood Trailer Co., 389

U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L. Ed.2d 1027 (1967).

## III.

■■ The most troublesome issue in this case concerns the board's imposition of a bargaining order to remedy the company's alleged violation of § 8(a)(5) when it refused to bargain with the union on June 14. Before the administrative law judge the company defended its refusal to bargain by arguing that by this date the union, in fact, no longer represented a majority and that it had at least a good faith doubt about the union's majority status.[3] The judge rejected both contentions, ruling that the company failed to prove the former[4] and that the § 8(a)(3) violations precluded the company from having a good faith doubt. Although the board agreed that the company violated § 8(a)(5) and adopted the administrative law judge's proposed order, the board's conclusion rests on a different basis. The board reasoned as follows:

"In adopting his conclusion that Respondent violated Sec. 8(a)(5), we do not rely on the finding of the Administrative Law Judge that Respondent's 8(a)(3) violations precluded a finding of a 'good-faith doubt' of majority status. Rather, we rely upon the fact that such serious violations of the Act tend to produce disaffections from a union and thus remove as a lawful basis for an employer's withdrawal [of] recognition the existence of a decertification petition or any evidence of loss of union support which, in other

3. The basic principles are well established. During the year following a union's certification, its majority status is, absent special circumstances, irrebuttably presumed to exist. NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir., 1966) see NLRB v. Burns Security Services, 406 U.S. 272, 279, n. 3, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). After expiration of the certification year, the presumption of majority status continues, but may be rebutted by a showing that when the employer refused to bargain there

was a serious doubt as to the union's continued majority status, Stoner Rubber Co., 123 N.L.R.B. 1440; NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir., 1969), or that the union, in fact, no longer represented a majority of the unit employees. Allied Industrial Workers, Local 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F. 2d 868, 881 (1973).

4. There is substantial evidence in the record to support this conclusion.

circumstances, might be considered as providing objective considerations demonstrating a free and voluntary choice on the part of the employees to withdraw their support for a union." [5]

The problem with this conclusion is that it is not factually related to this particular case. No consideration was given by either the administrative law judge or the board to the extensiveness or actual effect of the § 8(a)(3) violations on the majority status of the union. *See* Fremont Newspapers, Inc. v. NLRB, 436 F. 2d 665, 672 (8th Cir., 1970). *See generally* NLRB v. Gissel Packing Co., 395 U. S. 575, 615, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1968).

It is undisputed that the decertification petition filed on May 30, 1972, prior to the union's filing of any unfair labor practice charges, was the product of employee efforts. The company did not instigate the petition, aid in its circulation, or encourage, by threats or otherwise, its employees to sign the petition. No other unfair labor practices are present in this case, the record clearly indicating that the § 8(a)(3) violations were not part of a series of actions designed or calculated to dissipate or undermine the union's strength. Moreover, these violations were not flagrant or egregious in themselves, and they did not directly affect a large segment of the bargaining unit. *See, e. g.*, NLRB v. Arrow Specialities, Inc., 437 F.2d 522 (8th Cir., 1971); Flambeau Plastics Corp. v. NLRB, 401 F.2d 128 (7th Cir., 1968), cert. den. 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969). There is not even a hint that the lapse in contract negotiations between the end of

the strike in February and the demand for more bargaining on June 6 was attributable to the company's actions, attitude or, more specifically, to its treatment of the returning strikers. The move to obtain a decertification election began in the latter part of April, over two months after the end of the strike, and this activity did not occur in the shadow of questionable employer conduct.[6] It was in this relatively calm labor environment that the decertification petition was circulated and signed by enough employees to approach a majority of the bargaining unit.

Against this factual background and in the absence of any findings by the administrative law judge, the board said, in effect, that nothing the employer could establish would overcome the presumed impact of its unfair labor practices. To impose a bargaining order in these circumstances on the basis of this facile analysis is unwarranted. *Compare* Allied Industrial Workers, Local 289 v. NLRB, 155 U.S.App.D.C. 112, 476 F.2d 868, 882 (1973); Hinson v. NLRB, 428 F.2d 133, 136 (8th Cir., 1970), *with* Fremont Newspapers, Inc. v. NLRB, *supra*, 436 F.2d at 673; New Alaska Dev. Corp. v. NLRB, 441 F.2d 491, 494 (7th Cir., 1971). *See also* NLRB v. Gibson Products, Inc., 494 F.2d 762 (5th Cir., 1974).

We recognize that courts have, in deference to the board's expertise,[7] enforced bargaining orders where the record has been silent concerning "the actual impact of the employer's unfair labor practices." Arbie Mineral Feed Co. v. NLRB, 438 F.2d 940, 945 (8th Cir., 1971), *citing* NLRB v. Noll Motors, Inc.,

5. In his vigorous dissent from the board's conclusion regarding the § 8(a)(5) violation member Kennedy looked to the facts and concluded: "There is no reasonable basis for inferring either that the discriminatees or other employees were induced to withdraw their support from the union by the limited unfair labor practices found by the majority. . . . I do not minimize the violations found by my colleagues, but the Board has a responsibility to assess realistically the gravity of the unfair labor practices."

6. An objective reading of the record reveals a noticeable absence of the sort of anti-union animus which seems generally to underlie labor disputes of this character. *See, e. g.*, NLRB v. Sky Wolf Sales, 470 F.2d 827 (9th Cir., 1972); NLRB v. Frick Co., 423 F.2d 1327 (3rd Cir., 1970).

7. *See* NLRB v. Gissel Packing Co., 395 U.S. 575, 612, n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

433 F.2d 853 (8th Cir., 1970); NLRB v. Gerbes Supermarkets, Inc., 436 F.2d 19 (8th Cir., 1971). Both *Noll Motors* and *Gerbes Supermarkets*, however, involve unfair labor practices significantly different from the limited § 8(a)(3) violations present in the case at bar, and these cases furnish no support for enforcing the bargaining order here at issue. In *Noll Motors*, for example, the court said: "Clearly, the president's statements, the interrogations and the manager's statements considered as a whole justified the Board's findings of coercion and restraint. The statements went beyond prediction or expression of opinion, and violated Section 8(a)(1) of the Act." 433 F.2d at 855. The court also found substantial evidence to support the board's finding that Noll "refused in bad faith to recognize and bargain with the Union" and concluded that the company engaged in a series of unfair labor practices. *Id.* at 856. It is apparent, even from this brief discussion, that the board's imposition and the court's enforcement of the bargaining order in *Noll Motors* rested on record findings not at all analogous to those in the case at bar.

We agree with the Eighth Circuit's statement, made in a similar factual setting, that "in assessing the appropriateness of a bargaining order in the individual case, we must look to the nature of the employer's independent unfair labor practices and their actual impact upon the majority status of the union and the election process." Fremont Newspapers, Inc. v. NLRB, *supra*, 436 F.2d at 673. *See* Daisy's Originals, Inc. v. NLRB, 468 F.2d 493 (5th Cir., 1972); Arbie Mineral Feed Co. v. NLRB, *supra*. The *Fremont* court refused to enforce a bargaining order because "in light of the objective evidence of record, it is not reasonably possible to find that the inde-

pendent unfair labor practices here had any effect upon the Union majority or the potential decertification proceedings." *Id.* at 673.

The record in the case at bar leaves us with no choice but to decline to enforce the bargaining order. There is simply no factual basis from which to draw any conclusion concerning the impact of the company's § 8(a)(3) violations on the majority status of the union or on a potential decertification election. Even if a factual inquiry into the actual effect of a company's unfair labor practices is not always necessary in order to justify enforcing a bargaining order, our previous discussion illustrates that this is not such a case.

■ Although we decline to enforce the bargaining order, that does not end the matter because in the cases in which bargaining orders have been denied enforcement the courts have been able to conclude on the basis of a well developed record that the unfair labor practices "produced little or no impact upon the employees' allegiance to the union." Arbie Mineral Feed Co. v. NLRB, *supra*, 438 F.2d at 945; Daisy's Originals, Inc. v. NLRB, *supra*; Fremont Newspapers, Inc. v. NLRB, *supra*. *See also* New Alaska Dev. Corp. v. NLRB, *supra*. We are unable to make this determination on the basis of the record in this case. Moreover, we do not disagree with the general proposition that the type of unfair labor practices involved here *could* "tend to produce disaffections from a union." The question for the board is whether they did in the circumstances of this case. It is therefore necessary that we remand this aspect of the case to the board for further proceedings consistent with this opinion.

Enforced in part and remanded in part.