**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HONDO DRILLING COMPANY, N. S. L., Respondent.**

No. 74–4006.

United States Court of Appeals, Fifth Circuit.

Jan. 8, 1976.

Rehearing and Rehearing En Banc Denied Feb. 26, 1976.

Elliott Moore, Deputy Assoc. Gen. Counsel, Bert Bisgyer, Atty., N. L. R. B., Washington, D. C., W. Edwin Youngblood, Director, Region 16, N. L. R. B., Ft. Worth, Tex., for petitioner.

Brooks L. Harman, Odessa, Tex., for respondent.

Before GOLDBERG and AINS-WORTH, Circuit Judges, and NICHOLS,* Associate Judge.

AINSWORTH, Circuit Judge:

This case and a companion case, *National Relations Board v. A. W. Thompson, Inc.*, 5 Cir. 1975, 525 F.2d 870, were consolidated for purposes of argument on appeal. The matter is before us on petition of the National Labor Relations Board to enforce its order of September 11, 1974 against Hondo Drilling Company [Company]. The Board adopted the decision and order of the Administrative Law Judge who had found after a hearing that the Company was in violation of Sections 8(a)(5) and (1) of the National Labor Relations Act by withdrawing recognition from Local 826, International Union of Operating Engineers, AFL–CIO [Union], as the exclusive representative of the employees in the appropriate bargaining unit,[1] and by unilaterally granting Union employees "bottom-hole"[2] pay and across-the-board wage increases without first notifying and bargaining with the Union over these matters.

The sole issue for determination is whether substantial evidence on the record as a whole supports the Board's findings.[3] We conclude that it does and therefore enforce.

## BACKGROUND

The Company is a New Mexico corporation engaged in the business of drilling oil and gas wells in the Permian Basin area which covers approximately 160,000 square miles in West Texas and New Mexico. There are 50 to 60 drilling contractors who operate approximately 300 rigs in the Basin. The Union claims to represent bargaining units for 13 of these contractors. The Company owns six rigs, the use of which is dependent on the number of drilling contracts the Company has at a given time. When in use the rigs are operated on a 24-hour schedule by three crews working 8-hour shifts. Each crew normally consists of three or four roughnecks and one driller. When the well is completed the rig is moved to a new location or taken out of service until another job is available, and the men are either placed on the out-of-work list or transferred to another drilling site, depending on the availability of work and the desire of the men to transfer. The shortest time any rig drilled at one location was 4 days; the longest, 59 days. As a consequence of these circumstances, there is an unusually high employee turnover.

In 1967 the Union sought certification to represent the Company's roughnecks. Because of the high turnover of employees and their relatively short periods of employment, the Board devised a formula to determine voting eligibility.[4] On September 8, 1967, after an election which the Union won by a 26-to-6 vote (with 5 challenges), the Union was certified as the representative of the Company's drilling employees. Hondo refused to bargain in order to contest the certifi-

---

* Of the U. S. Court of Claims, sitting by designation.

1. The unit consists of: All derrickmen, motormen and floorhands, otherwise referred to as roughnecks, employed by the Employer in drilling operations in the area generally known as the Permian Basin, but excluding all toolpushers, drillers, office employees, technical employees, guards, professional employees and all supervisors as defined in the Act.

2. Bottom-hole pay is money paid to employees provided they remain on a particular job until the well is completed, in other words, until the bottom of the hole is reached.

3. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

4. The formula limits eligibility to vote
" . . . to all roughnecks who have been employed by the Employer for a minimum of 10 working days during the 90-calendar-day period preceding the issuance of our Decision and Direction of Election herein, and who have not been terminated for cause or quit voluntarily prior to the completion of the last job for which they were employed, as well as all roughnecks whose names appear on the Employer's payroll list immediately preceding the issuance of the Regional Director's Notice of Election in this proceeding." 164 N.L.R.B. 416, 418.

cation and the "Hondo formula." The Board found the Company in violation of the Act, and its order directing the Company to bargain was upheld by this Court in *N.L.R.B. v. Hondo Drilling Company*, 5 Cir., 1970, 428 F.2d 943, in which we approved the voting eligibility formula. Thereafter, following a period of unsuccessful contract negotiations, the Company filed an election petition with the Board. The ensuing election was again favorable to the Union by a vote of 28 to 2 (with 2 votes challenged) and the Union was certified for a second time on March 3, 1972.

Contract negotiations resumed, with J. D. Fortenberry and Kenneth Howell representing the Union, and Brooks L. Harman, attorney, and Walter Frederickson representing the Company. Five negotiating sessions were held during the period between the second Union certification and October 31, 1973, at which proposals and counterproposals were exchanged concerning virtually every phase of labor-management relations, including wage increases, holidays, vacations, overtime, hiring hall and arbitration procedures, a no-strike clause, and duration of the proposed contract. Although agreements on a number of proposals were reached, the parties remained at an impasse on certain items and no contract was executed. On August 5, 1973, the Company instituted "bottom-hole" pay for roughnecks working on Rig No. 3 without prior discussion or agreement with the Union. At the sixth negotiating session on October 31, 1973, the Company submitted a proposed bargaining agreement for consideration by the Union membership. The Union rejected the proposal and Fortenberry informed the Company of its rejection on November 12, 1973, at which time he offered eight counterproposals and requested a date for further negotiations. Two days thereafter the Company withdrew recognition from the Union by let-

ter in which Mr. Harman, attorney for the Company, announced:

> "Mr. Walter Frederickson telephoned me this morning and stated the company does not believe the Union represents a majority of bargaining unit employees and, therefore, refuses to recognize [the Union] . . . as the bargaining representative of its employees."

On the same day, November 14, 1973, and subsequently on December 3, 1973, the Company unilaterally put into effect new hourly wage increases.

## FINDINGS AND CONCLUSIONS OF THE BOARD

The Board refused to ascribe bad-faith bargaining to the Company during the period under consideration—May 19, 1973 [5] to November 14, 1973—concluding that the Company's conduct amounted to no more than hard bargaining not condemned by the Act. The Board concluded nevertheless that the Company violated Sections 8(a)(5) and (1) of the Act by engaging in the following unfair labor practices: (1) in withdrawing recognition from the Union on November 14, 1973 as the exclusive representative of the employees in the aforesaid appropriate unit, and by thereafter refusing to resume negotiations and bargain with the Union, and (2) in unilaterally granting its employees bottom-hole pay on August 5, 1973, and across-the-board wage increases on November 14 and December 3, 1973, without first notifying and bargaining with the Union over these matters.

## THE UNILATERAL ACTIONS OF THE COMPANY

### A. *Bottom-Hole Pay*

The Company attempts to justify this unilateral action by the urgency of the circumstances surrounding it. Frederickson testified that because of the un-

---

**5.** The cut-off date under Section 10(b) of the Act, which provides that no complaint shall issue based upon any unfair labor practice oc-

curring more than six months prior to the filing of the charge with the Board.

usually dangerous aspects of the particular job at Rig No. 3 and the great distance between the rig and the men's living quarters, an incentive was needed to employ a sufficient number of men who would remain on the job until the well was completed. He further testified that bottom-hole pay had been paid in 1969 to certain employees under similar circumstances and that he had consulted with Mr. Harman who advised him that the bottom-hole pay was not a negotiable matter inasmuch as Frederickson had done it before and it was customary in the oil fields.

█ The payment of wages is a statutory subject of collective bargaining under Section 8(d) of the Act, thus requiring that the matters of salary increases and bonus awards be submitted to the mediatory influence of collective bargaining. *See Fibreboard Paper Products Corp. v. N.L.R.B.,* 379 U.S. 203, 214, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). This is not a case where the Company, after a fruitless attempt to negotiate the bottom-hole bonuses, put into effect the proposed awards. *See N.L.R.B. v. Crompton-Highland Mills,* 337 U.S. 217, 224–225, 69 S.Ct. 960, 963, 93 L.Ed. 1320 (1949). The Company admits that it unilaterally granted the bottom-hole awards on August 5, 1973 without having first discussed the subject with the Union, an action conspicuously incompatible with the principle of collective bargaining. Its good-faith belief that its action was necessitated by the emergency nature of the situation did not excuse its failure to afford the Union the opportunity to negotiate the matter. While negotiations need not be exhausted to the point of impasse, some discussion is required prior to changing a condition of employment, *N.L.R.B. v. Citizens Hotel Company,* 5 Cir., 1964, 326 F.2d 601.

    B.  *Across-the-Board Wage Increases of November 14 and December 3, 1973*

The propriety of the salary increases, having been effected subsequent to the Company's withdrawal of Union recognition, is dependent upon the validity of that withdrawal, that is, upon whether the Company had reasonable and good-faith grounds for doubting the Union's continued majority status, *see N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 597, 89 S.Ct. 1918, 1931, 1932, 23 L.Ed.2d 547 (1969); *N.L.R.B. v. A. W. Thompson, Inc.,* 5 Cir., 1971, 449 F.2d 1333, 1336, *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972); *N.L.R.B. v. Gulfmont Hotel Company,* 5 Cir., 1966, 362 F.2d 588, 589. This brings us to a consideration of the reasons asserted by the Company as a basis for its action in withdrawing recognition from the Union.

## THE COMPANY'S WITHDRAWAL OF UNION RECOGNITION

██ Following a valid Board certification of a union, there is an irrebuttable presumption that its majority status continues for one year, in the absence of special or unusual circumstances. *Brooks v. N.L.R.B.,* 348 U.S. 96, 98, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954); *N.L. R.B. v. Anvil Products, Inc.,* 5 Cir., 1974, 496 F.2d 94, 96; *N.L.R.B. v. Gulfmont Hotel Company, supra,* at 589; *N.L.R.B. v. Leatherwood Drilling Company,* 5 Cir., 1975, 513 F.2d 270, *cert. denied,* —— U.S. ——, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). After the first year that presumption is rebuttable upon a showing by the Company that it had a good-faith doubt of the Union's continued majority status. *N.L.R.B. v. Gissel Packing Co., supra,* 395 U.S. at 597, 89 S.Ct. at 1981, 1982; *N.L.R.B. v. Leatherwood Drilling Company, supra,* at 272; *N.L.R.B. v. A. W. Thompson, Inc.,* 5 Cir., 1971, 449 F.2d 1333 at 1336. Before the Board the Company urged, as it does on appeal, that its withdrawal of Union recognition was indeed based on its good-faith doubt of the Union's continuing majority, asserting as a basis therefor (1) the unusual high labor turnover, (2) the Union's refusal to bargain in good faith on and after October 31, 1973 and its unreasonable counterproposals subsequently submitted for the first time, (3) the Union's efforts to discourage prospective

employees from working for the Company and to encourage those employed to quit, and (4) the apparent lack of employee enthusiasm for the Union. The Board rejected each of the considerations advanced by the Company as a foundation for a reasonable doubt. Our review of the record convinces us that it supports the Board's findings.

### A. Employee Turnover

The Company contends that because of the extremely high rate of employee turnover in the drilling industry, the situation is somewhat unique, requiring an exception to the normal presumption of continued Union representative status. Illustrative of this fluctuation in rig personnel, the Company calls attention to evidence which shows that during the 6-month period prior to November 14, 1973, it employed 415 crew members to fill a maximum of 78 jobs. For the two years following certification in 1972, the Company had an employee turnover of 1500 and 1700 per cent, respectively. The percentage of turnover of roughnecks from pay period to pay period during the 6-month period under consideration varied from a low of 17 per cent to a high of 58 per cent, an average of 35 per cent to 36 per cent turnover between pay periods. The Company contends that the drastic turnover situation was one of the primary reasons that it doubted the Union's majority status; that the Company through Frederickson was aware that very few roughnecks remain with the company constantly and that during the 20 months of certification, out of 971 roughnecks employed only 3 of the unit employees eligible to vote in the February 1972 election were still working for the Company in November 1973 when union recognition was withdrawn. It is the Company's position that because of this extremely high turnover, sometimes reaching more than 100 per cent in a pay period, it is inconceivable that anyone in Frederickson's position would not believe the Union did not represent a majority of the Company's employees.

This argument is foreclosed by our decision in the consolidated cases of *N.L. R.B. v. Leatherwood Drilling Company* and *N.L.R.B. v. Brahaney Drilling Company*, 5 Cir., 1975, 513 F.2d 270, *cert. denied*, —— U.S. ——, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), in which similar arguments under circumstances factually indistinguishable were made and rejected. Leatherwood and Brahaney, like Hondo in the present case, are drilling companies operating in the Permian Basin. They too are represented by Local 826, International Union of Operating Engineers, AFL–CIO, which was certified following an election in which the "Hondo formula" was used for determining voter eligibility. Both Leatherwood and Brahaney withdrew recognition from the Union because of their alleged good-faith doubt of the Union's continuing majority. Unfair labor charges were filed, and in subsequent proceedings in which the companies were represented by Mr. Harman, the same attorney representing the Company here, the Board found both companies to be in violation of Sections 8(â)(5) and (1) of the Act. This finding was made despite a 900 per cent employee turnover evidencing that less than 4 of the original certification voters out of approximately 77 employees, in each case, had remained on their jobs. The Board noted that counsel Harman was "highly familiar with the history of organization by this Union in the Permian Basin." 513 F.2d at 273. On appeal the sole issue for review was whether substantial evidence on the record considered as a whole supported the Board's findings that neither Leatherwood nor Brahaney had reasonable grounds for doubting the Union's continued majority status. In enforcing the Board's order we said, with regard to the emphasis placed by Leatherwood and Brahaney on the magnitude of the employee turnover, "[I]n our view, this only reargues what has been decided in *Hondo*,[6] i. e., that turnover is inherent in this

---

6. *N.L.R.B. v. Hondo Drilling Company*, 5 Cir., 1970, 428 F.2d 943.

industry and cannot be given independent significance as a sign of Union weakness." 513 F.2d at 273.

### B. The Union's Alleged Refusal to Bargain in Good Faith on and after October 31, 1973, and Its Alleged Unreasonable Counterproposals

At the October 31 meeting the Company submitted a new proposed contract which contained several provisions to which Howell, representing the Union, voiced his objections. Included among the objectionable provisions were a nonmandatory arbitration clause, a clause reserving to the Company the unilateral right to grant subsistence allowances to employees, and a clause recognizing the Company's unilateral right to grant wage increases to meet competition. Howell said he would call a meeting to vote on the Company's proposals and would advise the Company of the employees' decision. On November 12 the Company was advised by letter of the Union's rejection of the proposed contract. The letter also contained eight counterproposals, four of which embodied new demands relating to a union shop for the Company's New Mexico operations, shift differentials, a cost-of-living escalator clause, and free meals for employees working beyond two hours of their usual quitting time. Despite the fact that the Company's proposed contract contained new items as well as items previously rejected by the Union, the Company contended before the Board that the new Union proposals, submitted after six negotiating sessions, were unreasonable, constituted bad-faith bargaining and led Frederickson to believe that the Union was not seeking a contract. This belief, the Company contends, had a big influence on Frederickson's doubt of the Union's majority status. We are unable to follow the logic of this conclusion. As the Administrative Law Judge observed when considering this contention, there is nothing in the Union's proposals "which could reasonably suggest to the Respondent that its employees had rejected union representation. The most that can be said is that the Union was seeking better contract terms than those the Respondent was offering."

### C. The Union's Alleged Efforts to Discourage Prospective New Employees and to Encourage Present Employees to Quit the Company

Assuming arguendo that the Company allegations of Union members dissuading roughnecks from working for the Company were substantiated by the record, it is difficult to determine how the Company inferred therefrom that the Union no longer represented the majority of its employees. At most such conduct implies employees dissatisfaction with the Company. However, it is unnecessary to speculate on the Company's theory since the Board found, and the record supports that finding, that the alleged reports which Frederickson testified influenced him to withdraw recognition from the Union were wholly unsubstantiated by any probative evidence.

### D. Alleged Lack of Employee Enthusiasm for the Union

The Company attributes inquiries made by the roughnecks, relative to when they would receive wage increases comparable to increases received by roughnecks employed by other drillers, to lack of enthusiasm for Union representation. The Board was unable to find anything in these inquiries which demonstrate displeasure with union representation, nor can we.

Enforced.