353 So.2d 108 (1977)
PASCO COUNTY SCHOOL BOARD, Petitioner,
v.
FLORIDA PUBLIC EMPLOYEES RELATIONS COMMISSION and Pasco County Classroom Teachers Association, Respondents.
No. CC-38.
District Court of Appeal of Florida, First District.
November 16, 1977.
Rehearing Denied January 9, 1978.
*113 Joe A. McClain of McClain, Hobby & Greenfelder, Dade City, for petitioner; John Edward Alley and Daniel H. Kunkel, of Alley & Alley, Miami, of counsel.
Jack L. McLean, Jr. and Austin F. Reed, for respondent Florida Public Emp. Relations Commission; Sidney L. Matthew, Tallahassee, for respondent Pasco County Classroom Teachers Ass'n.
ERVIN, Judge.
The Pasco County School Board has filed its petition to review an order of the Florida Public Employees Relations Commission (PERC) finding it committed certain unfair labor practices in violation of Section 447.501(1)(a), (b) and (c) of the Public Employees Relations Act (PERA). PERC has also filed its petition to enforce the order entered.
The School Board has presented the following issues to us for our consideration: 1. The General Counsel of PERC should not be permitted to prosecute unfair labor practice charges. 2. The final order is formulated in violation of the procedural protections incorporated in the Administrative Procedure Act to the detriment of the School Board. 3. The School Board did not act against certain named discriminatees in retaliation for their union activity. 4. The School Board did not violate its duty to bargain with the PCTA. 5. PERC improperly relied on the special master's report to support findings of fact. 6. PERC ordered reinstatement with back pay contrary to the hearing officer's recommendation that a *114 separate hearing be held to determine the appropriate amount to be awarded.
The School Board entered into a collective bargaining agreement with the Pasco Classroom Teacher's Association (PCTA) effective September, 1974 through June 30, 1975. Following certification of PCTA by PERC, negotiations were conducted between the parties from April 24, 1975 until July 28, 1975, and when no fruitful bargaining could be obtained, an impasse was declared on July 28, 1975. Pursuant to Section 447.403, Florida Statutes (1975), a special master was appointed by PERC to reconcile the differences between the parties. Later, complaints were filed in separate cases before PERC charging the Board with the following unfair labor practices: The School Board on March 24, 1975, as a result of non-tenured teacher Ronald Eckstein's union activity, refused to grant Eckstein a continuing contract for the school year 1975-76, and to reappoint him as head of the social studies department at Hudson High School. Two other complaints charged the Board with discriminatorily refusing to rehire probationary instructors Sharyn Disabato and Fred Rydzik, because of their union activities, for the 1975-76 school year. A fourth complaint charged that following the certification of PCTA by PERC, on April 17, 1975, as the collective bargaining agent for instructional personnel employed by the Board, and during collective bargaining negotiations, on June 3, 1975, the Board unilaterally, and without notice to PCTA, reduced salaries for the 1975-76 school year for all instructional personnel, froze a step increase which had been negotiated under the 1974-75 contract and reduced all teacher salary supplements.
A hearing was held before a DOAH hearing examiner on the four complaints. At the conclusion of the testimony an order was entered recommending the charges be sustained. PERC, after reviewing the record, concluded there was "ample evidence" to support the complaints and entered a final order directing (1) that Disabato and Rydzik be reinstated to their former or equivalent positions and be made whole for any loss of earnings; (2) that Eckstein be appointed to continuing contract, be reappointed head of the social studies department, and be made whole for any loss of earnings; (3) that the Board restore all employee salaries to the level existing before the Board unilaterally decreased wages during bargaining, pay interest on the amounts withheld and restore two planning days which the Board eliminated from the 1975-76 school year; and (4) that the Board cease and desist from interfering with and restraining or coercing employees from any of the rights guaranteed them under PERA.

I. WHETHER THE GENERAL COUNSEL OF PERC SHOULD BE PERMITTED TO PROSECUTE UNFAIR LABOR PRACTICE CHARGES.
The Board argues it has been prejudiced by the General Counsel's prosecution of the unfair labor practices, contending there is no specific statutory authority under PERA permitting PERC to prosecute such charges. The Board is correct that there is no such explicit statutory authority. Section 447.503(1), Florida Statutes (1975), authorizes the Commission, or its agent, to conduct a preliminary investigation to determine whether there is substantial evidence indicating a prima facie violation of an applicable unfair labor practice provision. If it is determined there is such evidence, PERC or its agent shall cause to be served upon the person charged with the violation a copy of the charges and a notice of the hearing before the Commission. The statute, however, is silent as to the grant of any specific authority to prosecute such charges following the investigation and the filing of the complaint, although Fla. Admin. Code Rule 8H-4.08 permits the General Counsel of PERC to "assume part or all of the burden of presenting the evidence in support of the allegations in the complaint."[1]
The record does not reveal the Board at the administrative level ever asserted *115 any objection it was prejudiced by the General Counsel's prosecution of the charges. It did not challenge Rule 8H-4.08 as having been adopted without any validly delegated legislative authority. See Section 120.56, Florida Statutes (1975). The Board has failed to demonstrate it was prejudiced by the General Counsel's prosecutorial position. A combination of investigative, prosecutorial and adjudicative functions in one body does not per se create an unconstitutional risk of bias and one so claiming must show prejudice. Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). We therefore decline to express an opinion as to whether there was valid delegation of authority to PERC to prosecute unfair labor charges in the absence of either a timely challenge to the Rule or an objection at some stage in the administrative proceedings.
Nor is it a point which we may consider for the first time on review as fundamental error. It is not fundamental error. Section 120.68(2) provides that review proceedings from administrative action "shall be conducted in accordance with the Florida Appellate Rules." We are authorized by Fla.App. Rule 3.7 i to consider any jurisdictional or fundamental error which is apparent in the record, even though objection to it was not made at a lower level. A fundamental error exists if its correction can be deemed essential to the object and purpose of the proper administration of justice. Custer v. State, 159 Fla. 574, 34 So.2d 100 (1948). We do not consider the record reveals the asserted error so fundamental as to be essential to the proper administration of justice.

II. WHETHER THE FINAL ORDER IS FORMULATED IN VIOLATION OF THE PROCEDURAL PROTECTIONS INCORPORATED IN THE ADMINISTRATIVE PROCEDURE ACT TO THE DETRIMENT OF THE SCHOOL BOARD.
The Board argues the final order of PERC so intermingles findings of fact and conclusions of law that it is impossible to determine whether the order based its holdings on particular fact situations or on interpretations of the law. We must disagree. While the final order of the Commission is not a model of perfection, nevertheless it was not violative of Section 120.59(1) requiring that findings of fact and conclusions of law be separately stated. PERC's order specifically adopted the findings of the hearing officer. The hearing officer submitted a detailed report and recommended order separately stating his findings and recommendations. Section 120.57(1)(b)9 allows the agency to adopt the recommended order as the agency's final order or to reject or modify the conclusions of law. It specifically prohibits the agency's rejection or modification of the findings of fact unless the agency first determines from a review of the complete record, and states with particularity in the order that the findings of fact were not based upon competent substantial evidence.
We are not confronted with the situation involved in Venetian Shores Home & Prop. Own. v. Ruzakawski, 336 So.2d 399 (Fla. 3rd DCA 1976); Harvey v. Nuzum, 345 So.2d 1106 (Fla. 1st DCA 1977), and McDonald v. Dept. of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977), where the reviewing agency simply rejected the hearing officer's findings of fact out of hand without stating with particularity its reasons for so doing.
The action of an agency, following a full hearing before a hearing examiner, is in the nature of a procedural review. Venetian Shores Home & Prop. Own. v. Ruzakawski, supra. The findings of fact reported by a hearing officer to the reviewing agency become binding on the agency in the absence of an explicit determination that the findings were not based upon competent substantial evidence or that they did not comport with the essential requirements of law. Bolinger v. Division of *116 Retir., State Dept. of Admin., 335 So.2d 568 (Fla. 1st DCA 1976).

III. WHETHER THE SCHOOL BOARD ACTED AGAINST THE THREE ALLEGED DISCRIMINATEES IN RETALIATION FOR THEIR UNION ACTIVITY.
The Board attacks that portion of PERC's order finding that the decisions not to rehire or to grant tenure to the discriminatees were made in retaliation for their union activity, complaining it is not based upon the whole record and that certain statutory standards for not renewing probationary contracts were misapplied by PERC. This issue brings into consideration the interplay between the applicable provisions of PERA, the APA and the National Labor Relations Act (NLRA).
Since this is a case of first impression, it is helpful to look to cases from foreign jurisdictions involving the interpretation of similar provisions in statutes of other states or federal statutes. State ex rel. Feldman v. Kelly, 76 So.2d 798 (Fla. 1954). If a Florida statute is patterned after a federal law, on the same subject, it will take the same construction in the Florida courts as its prototype has been given in the federal courts insofar as such construction is harmonious with the spirit and policy of Florida legislation on the subject. Kidd v. Jacksonville, 97 Fla. 297, 120 So. 556 (1929); State ex rel. Packard v. Cook, 108 Fla. 157, 146 So. 223 (1933).
PERC concluded that the Board's decisions not to rehire Disabato and Rydzik or to promote Eckstein were violations of Sections 447.501(1)(a)[2] and (b).[3] Section 447.501(1)(b) reflects the strong influence of Section 8(a)(3) of the NLRA (61 Stat. 140 (1947), 29 U.S.C. § 158(a)(3) (1970)), providing in part that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization... ."
PERC's order concluding that discrimination occurred was buttressed upon highly conflicting evidence: The testimony of the discriminatees and their witnesses that the Board's decisions affecting their employment were due to their union activity, and the Board's testimony the decisions were made as a result of the teachers' deficient performance. Section 120.68(10) directs that we not substitute our judgment for that of the agency as to the weight of evidence on any disputed finding of fact. We may only set aside such action or remand the case to the agency if we find the agency's order depends upon any finding of fact which is not supported by competent substantial evidence in the record. It is not appropriate for us to resolve conflicts in the testimony adduced before an administrative tribunal. Pauline v. Lee, 147 So.2d 359, 363 (Fla. 2nd DCA 1962); nor is it our province to displace an agency's choice between two conflicting views even if we would be justified in deciding the issue differently were it before us in the first instance. NLRB v. Big Three Industries, Inc., 497 F.2d 43 (5th Cir.1974). Expert tribunals are entitled to the greatest deference in recognition of their special competence in dealing with labor problems. In many areas their evaluation of the competing interests of employer-employee should unquestionably be given conclusive effect in determining the application of the pertinent sections of the Act. American Ship Building v. Labor Board, 380 U.S. 300, 316, 85 S.Ct. 955, 13 L.Ed.2d 855 (1964). Such deference must be qualified by the reservation that courts should not "slip into ... judicial inertia which results in the unauthorized assumption by an agency of major policy decisions ..." American Ship Bldg. v. Labor Board, 380 U.S. at 318, 85 S.Ct. at 967.
*117 It is not our intention to review conflicting evidence so long as such evidence has a competent and substantial foundation. Agency considerations of claims based upon unfair labor practices necessarily involve considerations different from those in other agency proceedings. Our primary inquiry will be to determine whether, this being a case of first impression, the agency has erroneously interpreted a provision of law. Section 120.68(9). In order to determine whether the evidence sustains a charge alleging an unfair labor practice, when it is grounded upon an asserted violation of protected activity, the following general principles should be considered by the hearing officer and by PERC:
In any such proceeding the burden is upon the claimant to present proof[4] by a preponderance[5] of the evidence that (a) his conduct was protected and (b) his conduct was a substantial or motivating factor in the decision taken against him by the employer.[6]
(2) If the hearing officer determines the decision of the employer was motivated by a non-permissible reason, the burden shifts to the employer to show by a preponderance of the evidence that notwithstanding the existence of factors relating to protected activity, it would have made the same decision affecting the employee anyway.[7] In considering the employer's explanation, the examiner should attempt to strike an equitable balance between the rights of an employer whose duty, as here, is to promote the efficiency of public services through its public employees, and the rights of a non-tenured public school teacher to be secure in his employment, free from discrimination due to his union activity.[8]
*118 (3) PERC, when reviewing the hearing officer's recommendations, shall evaluate them pursuant to the procedure set forth by Section 120.57(1)(b)9, requiring generally that before PERC reject or modify the hearing officer's findings of fact that it first determine from a review of the entire record the findings were not based on competent substantial evidence.
The testimony at the hearing pertaining to the alleged discrimination by the Board of the three non-tenured school teachers was basically the same. During the spring of the 1974-75 school year all three discriminatees were nominated officers of their union. At the conclusion of the same school year, the Board chose not to rehire Disabato and Rydzik, and declined to grant Eckstein tenure following three years' service by him. All three had served as building representatives for PCTA and in such capacity presented other teachers' grievances to their principals. Nevertheless all three principals were careful to testify that their decisions not to renew or promote were based not upon union activity but rather upon the teachers' poor performance.
The evidence relating to their effectiveness as school teachers was remarkably similar. Prior to their involvement with the union all had been evaluated by their employers as effective (Rydzik), outstanding (Disabato) or superior (Eckstein) during the 1973-74 school year. As their union activities increased, their instructional performance the following school year, according to their principals, decreased. For example Disabato's principal testified that during the 1974-75 school year, her tone and mannerisms toward him became increasingly antagonistic and hostile, and she developed a reputation as being overly harsh with the students. During her evaluation in February 1975, her principal advised her she needed to improve rapport with her professional peers and improve cooperation with the administration. After considering the cumulative problems he had encountered, her concluded it was necessary not to renew her probationary contract, believing he could hire as competent a teacher who would not create such conflicts in school.
Rydzik's principal gave testimony somewhat similar as to Rydzik's performance. On February 21, 1975, his principal evaluated him as middle effective and needing improvement in two categories, daily planning and bathroom duties. He concluded he could hire another teacher who would more competently perform the responsibilities assigned; hence he decided not to renew Rydzik's contract. An additional reason he gave was that it was necessary to reduce the instructional staff by three at the junior high school where Rydzik taught due to a reduction in the student body. Other evidence however reflected that six instructors left school at the end of the school year, yet Rydzik was not rehired. When confronted with such facts, the principal responded he would not rehire Rydzik anyway.
Eckstein's performance also declined during the 1974-75 school year, notwithstanding his evaluation the preceding year as a superior teacher. In March, 1975, Eckstein was rated both outstanding and effective by his principal except in the area of objectivity on theoretical or controversial topics, where he was rated as needing improvement. Four teachers at the hearing related incidents in which Eckstein both harassed *119 other instructional personnel and used abusive language in their presence.
In their behalf, the three discriminatees presented testimony by members of their peer group pertaining to their professional competency. For example, during the year 1973-74, Disabato was selected by her fellow teachers as teacher of the year. Contrary to her principal's testimony that she had difficulty in cooperating with other instructors, various teachers stated they had no knowledge of any problems she had in getting along with peers. Several teachers testified they considered her an excellent teacher. Similar testimony was offered on behalf of Rydzik. Certain teachers testified they considered Rydzik an excellent teacher whom the students admired and that his plan book was outstanding.
Ronald Eckstein, like Disabato, was nominated by his fellow teachers as the teacher of the year during the school year 1973-74 at his high school. Several teachers also said they considered Eckstein an excellent teacher, and following the decision not to grant him continuing contract, many teachers were afraid to associate freely with PCTA members, resulting in the union experiencing membership problems at Eckstein's high school.
A finding of an unfair labor practice here necessarily depended upon circumstantial evidence. The presence of an anti-union motivation by an employer is a factual matter which the NLRB may resolve upon circumstantial evidence from the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Singer Company v. NLRB, 429 F.2d 172 (8th Cir.1970); Ridgely Manufacturing Co. v. NLRB, 166 U.S. App.D.C. 232, 510 F.2d 185 (1975). And in the absence of a showing of such motivation, an employer may discharge or suspend an employee for a good reason, a bad reason, or no reason at all. NLRB v. O.A. Fuller, 374 F.2d 197 (5th Cir.1967).
All three discriminatees were evaluated effective employees by their principals prior to their union activities. After their activities in the union became involved, their evaluations contained marked deficiencies. The timing of the decision by the employer in connection with the employee's union activity is a proper consideration to a determination whether an unfair labor practice was committed. A discharge of an employee, followed closely on the heels of an employer's display of anti-union animus, supports a finding of an unfair labor practice. St. Joseph Hospital v. Pennsylvania Labor Relations Board, 16 Pa. Cmwlth. 533, 330 A.2d 561 (1974). While the evidence may have been questionable as to whether the Board's agents were aware the union had nominated the discriminatees for union office prior to the decisions not to renew or to promote, nevertheless there was ample evidence they had knowledge that all three teachers were active in the union during the 1974-75 school year.
The Board additionally complains that the hearing officer's findings and PERC's order sustaining them were not based upon competent substantial evidence since they depended in part upon opinion and hearsay evidence. In all three cases opinion testimony was offered by the three discriminatees' peer group, other teachers, that they considered the discriminatees outstanding teachers. Other testimony was to the effect that as a result of the actions taken against Rydzik and Eckstein, they were fearful of becoming involved with the union and had talked to other teachers who had expressed similar fears. Insofar as the agency's findings depended upon opinion testimony, we have previously stated that a reviewing court should give less weight to the hearing officer's findings in determining the substantiality of such evidence. McDonald v. Department of Banking and Finance, supra, 346 So.2d at 579. Yet the employers expressed their opinions that each of the discriminatees did not measure up to the mark expected, contributing to the decision not to rehire or promote. The hearing officer and PERC properly considered the challenged testimony and appropriately resolved the issue against the Board.
*120 The Board's complaint that PERC's order was supported by hearsay deserves special attention. For example, the Board objects to the finding in PERC's order that "the record further reveals that other annual contract teachers are reluctant and unwilling to be publicly involved in the union, serve as building representatives, or merely become union members, as a result of the demotion and failure to extend tenure to Eckstein." This portion of the order was supported in part by the testimony of teachers Jerry Morriss and Kenneth Sennholtz that other teachers informed them they felt inhibited from joining the union due to Eckstein's failure to be granted tenure, and were even fearful of talking to union leaders. It is questionable whether the opinions relayed by non-testifying witnesses to Morriss and Sennholtz met the competent and substantial test necessary to support such findings.
If the entire evidence presented were only hearsay, then clearly we would be required to set aside agency action not supported by competent and substantial evidence. But as previously indicated there was other competent evidence, primarily circumstantial, before the hearing officer. Moreover other teachers directly testified as to their own apprehensions of retaliation. Section 120.58(1)(a) allows the admission of hearsay at agency hearings when used for the purpose of supplementing or explaining other evidence but precludes its admission if solely used to support a finding unless it would be admissible over objection at civil actions. Cf. Poirier v. Division of Health, State of Florida, Department of Health and Rehabilitative Services, 351 So.2d 50 (Fla. 1st DCA 1977). Thus if hearsay is corroborated by otherwise competent substantial evidence, it is admissible.
We have determined that competent and substantial evidence supported the conclusions of both the hearing examiner and PERC that a substantial or motivating factor leading to the decisions not to rehire or to promote was due to the employees' union activity. Once the hearing officer made a finding that the greater weight of the evidence showed the employer's action was motivated substantially or partially by the employee's protected activity, the burden was placed upon the employer to show by a preponderance of evidence that notwithstanding such factors, the decisions would have been made anyway. Mt. Healthy City Board of Ed. v. Doyle, supra.
The Board argues that under existing law it is not required to give any reason for failing to renew an expired public teacher's probationary contract, stating that the purpose of Section 231.26, Florida Statutes (1975), requiring the probationer be placed on annual contract the first three years of his employment, is to permit the school board to select those personnel whom it believes to be most qualified to retain permanently.
In considering the concomitant interest of the district school boards to promote the efficiency of its public services it performs through its employees, delegated to the boards by constitutional grant, Art. IX, Section 4, PERC should give due regard to the pertinent statutes enacted to achieve such ends. A complete reference to all such statutes would be exhaustive, but special attention should be directed to Section 231.29(2) authorizing the superintendent, "[f]or the purpose of improving the quality of instructional ... services in the public schools of the state," to "establish procedures for assessing the performance of duties and responsibilities of all [such] . . personnel employed in his district . .", and to the statutory procedure outlined in Section 231.36 pertaining to the conditions necessary to achieve a grant of continuing contract.
The Board should be allowed a certain degree of latitude to improve the quality of instructional services within the public schools. "There can be no doubt of the right of the state to investigate the competence and fitness of those whom it hires to teach in its schools, ...", Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960), nor that the Board has a vital concern in obtaining qualified personnel to shape "the attitude of young *121 minds towards the society in which they live." Adler v. Board of Education of City of New York, 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517 (1952). "That the school authorities have the right and the duty to screen the ... teachers, and employees as to their fitness to maintain the integrity of the schools as part of an ordered society cannot be doubted." Ibid. at 493, 72 S.Ct. at 385.
Counterbalanced against the Board's authorized duty to promote the efficiency of its public services is the right of even a non-tenured school teacher not to be discriminated against because of union activity. "[T]he theory that public employment, which may be denied altogether, may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian v. Board of Regents, 345 F.2d 236, 239 (2nd Cir.1965). "Interference with personal freedom is conspicuously accented when the teacher serves at the absolute will of those ... who any year can terminate the teacher's employment without bringing charges, without notice, without a hearing, without affording an opportunity to explain." Shelton v. Tucker, supra, at 486, 81 S.Ct. at 251. And where protected activity is involved, a public employer may not arbitrarily refuse to renew even a probationary teacher's contract. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). "... [W]ith the exception of the right to strike, public employees have the same rights of collective bargaining as are granted private employees by Section 6." Dade County Classroom Teachers Ass'n. v. Ryan, supra, 225 So.2d at 905.
The hearing examiner's recommended order did not take into consideration the above factors. It relied instead, in reaching the conclusion the Board had discriminated against the three employees because of their union activity, upon traditional concepts of discharge in the labor relations field, stating:
"It is common knowledge in the labor area that an employer can discharge an employee for any reason or no reason at all, however, he cannot discharge an employee for engaging in any activities protected by rights guaranteed to such employee by statute. Thus, for example an employer is free to discharge an employee when he engages in protected activity and there is just cause and the just cause is the sole reason which prompts the dismissal... . An employee's participation in union activities does not insulate him from discharge `for cause' however, when such employee engages in such activities, and when that activity is well known by the employer, care must be taken by the employer to be sure that he does not run afoul of the labor laws."
The hearing examiner committed the same error as the District Court in Doyle by failing to determine whether the decision affecting the discriminatees would have been reached despite the presence of a non-permissible reason. The following observations by the Court in Doyle have particular relevancy here:
"A rule of causation which focuses solely on whether protected conduct played a part, `substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision  even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by *122 engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.
This is especially true where, as the District Court observed was the case here, the current decision to rehire will accord `tenure.' The long term consequences of an award of tenure are of great moment both to the employee and to the employer. They are too significant for us to hold that the Board in this case would be precluded, because it considered constitutionally protected conduct in deciding not to rehire Doyle, from attempting to prove to a trier of fact that quite apart from such conduct Doyle's record was such that he would not have been rehired in any event." 429 U.S. at 285-286, 97 S.Ct. at 575.
Finding there has been an erroneous interpretation of a provision of law, Section 120.68(1), we think the interests of the parties would be best served by vacating that portion of the order sustaining the hearing examiner's recommendation an unfair labor practice occurred as it affected the discriminatees, and by remanding to the hearing officer for an appropriate determination of the question.

IV. WHETHER THE BOARD VIOLATED ITS DUTY TO BARGAIN WITH THE PCTA.
PERC's order sustaining the charge the Board violated Section 447.501(1)(c) by committing a unilateral act during bargaining negotiations requires that we again compare the pertinent provisions of PERA with the NLRA. Section 447.501(1)(c) prohibits public employers from "refusing to bargain collectively, failing to bargain collectively in good faith, or refusing to sign a final agreement agreed upon with the certified bargaining agent for the public employees in the bargaining unit." Moreover Section 447.309(1) requires, after an employee organization has been certified, the respective bargaining agents for the employer and employee "shall bargain collectively in the determination of the wages, hours and terms and conditions of employment of the public employees within the bargaining unit."
The corresponding provisions of the NLRA, 29 U.S.C. § 158(a)(5) (1970), states:
"(a) It shall be an unfair labor practice for an employer 
* * * * * *
(5) to refuse to bargain collectively with the representatives of his employees, ... ."
Additionally 29 U.S.C. § 158(d) (1970) makes it the "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, ... ." Under Section 8(d), the payment of wages is a statutory subject of collective bargaining, requiring matters of salary increases and bonus awards be submitted to the mediatory influence of collective bargaining. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 214, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). However Section 8(d), while demanding the parties bargain collectively, "does not compel either party to agree to a proposal or require the making of a concession...."[9] The NLRB's power of compulsion is limited to directing the parties to bargain about subjects properly within the scope of collective bargaining. National Licorice Co. v. NLRB, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1939). Merely meeting together or manifesting a willingness to talk does not discharge the duty to bargain. Tex Tan Welhausen Co. v. *123 NLRB, 419 F.2d 1265, 1268 (5th Cir.1969), cert. den. 402 U.S. 973, 91 S.Ct. 1663, 29 L.Ed.2d 138 (1971). Moreover sophisticated pretense in the form of apparent bargaining, sometimes referred to as shadow boxing or surface bargaining, will not satisfy a party's duty under the Act. NLRB v. Herman Sausage Co., 275 F.2d 229 (5th Cir.1960).
The statutory duty to bargain prohibits an employer from imposing unilateral changes in working conditions during the pendency of negotiations. Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); NLRB v. Hendel Mfg. Co., 523 F.2d 133 (2nd Cir.1975); Great Southern Trucking Co. v. NLRB, 127 F.2d 180 (4th Cir.1942), cert. denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524. A unilateral action by an employer affecting changes in wages and working conditions has generally been held justified only after the parties have bargained to impasse. NLRB v. King Radio Corp., 416 F.2d 569 (10th Cir.1969), cert. den. 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420. When the Board instituted its cuts on June 3, 1975, bargaining was still in progress. Impasse was not declared until June 28, 1975.
The testimony at the hearing pertaining to the unilateral action charge showed that after negotiations were instituted effective April 24, 1975, PCTA on that date submitted its first proposal for a $12,000.00 salary base, which represented an increase of approximately 50% over the 1974-75 contract. The Board did not offer a counter-proposal until May 6, 1975, which consisted of a blank page instead of specific salary proposals due to financial uncertainty of the school budget for the 1975-76 year. The negotiator for the Board, Ronald Forguson, asserted his failure to submit specific salary proposals was owing to the Board's lack of financial information sufficient to submit a counterproposal. Nevertheless, he stated the parties to the contract continued negotiating on such items until the information was available, although he admitted no specific salary amount was proposed by the Board before June 3, 1975.
On May 6, 1975, Superintendent Weightman recommended to the Board a 1975-76 salary schedule freezing salaries at the same level as the preceding school year, which the Board adopted. Later on June 3, 1975, at a School Board meeting and not during a bargaining session, the Board, following the recommendations of the superintendent, adopted a 1975-76 salary schedule for all Board employees, including a 5% cut in salaries, a 5% cut in supplements, a freeze on increments and a change in the school calendar which eliminated pre-school planning days. This change was made without prior notification to PCTA's bargaining representative.
The Board presented evidence showing that its actions were necessary due to incomplete financial information. The Board's budget analyst Marilyn Hall said she was fearful of a budget deficit for the coming fiscal year since the budget, previously prepared, had omitted to allocate funds for workman's compensation insurance or for increased liability and fire insurance premiums. Her fears were compounded by the prior budget's anticipation of federal revenues for the food services program which did not materialize, and by the State Department of Education's reallocation of over $1,000,000.00 from the operating section of the budget to the capital outlay section. Believing there was a real danger of a deficit occurring in the 1975-76 budget unless steps were immediately taken, Ms. Hall relayed this information to the superintendent, thus leading to the 5% budget cuts on June 3, 1975.
The Board offered testimony it would normally have continued negotiations on this matter, however due to the provisions in the forms provided to the Board by the Department of Education then in effect, if tenured teachers were not given at least 30 days notice of a proposed reduction in salary, their salaries for the succeeding school year could be no less than the amount paid the preceding year. Since the school year *124 began on July 3,[10] and believing that a deficit would occur in the coming school fiscal year, the Board felt it was required to make the cuts no later than June 3.[11]
Notwithstanding the action taken by the Board on June 3, 1975, both the Board and the PCTA continued to bargain over salaries until July 3, 1975 when the School Board offered a 3% reduction from the preceding school year budget as a temporary salary schedule for the 1975-76 school year pending resolution of the budget crisis.
The Board's argument it was necessary to effect the cuts without prior notification to PCTA's bargaining representative because of the Department of Education's regulation requiring it either to increase or decrease salaries within 30 days before the beginning of the school year, otherwise tenured teachers would by operation of the law be reemployed at the same salary rate for the preceding year, is not convincing. The Board's negotiator, Ronald Forguson, testified that even before PCTA's proposed pay package was submitted to him on April 24, 1975, he had known since February the Board had a freeze on spending. After PCTA presented its pay increase proposals to the Board, no offer or counter-proposal was submitted by it through its negotiator before May 6, 1975, when the Board, upon the recommendation of Superintendent Weightman, met and adopted the same salary schedule for teachers as had been in effect the previous year. Between May 6, and June 3, 1975, the Board's response to PCTA's proposals was only a blank page for salaries. The Board never afforded notice to PCTA's bargaining representative of its intention to reduce salaries by 5% before the June 3rd meeting. When the proposal was recommended to the Board by the superintendent, the bargaining representative, Larry Smith, voiced his objection to the reductions claiming they were an illegal unilateral action. During the hearing on the unfair labor practice charges, the superintendent unambiguously testified that to his knowledge none of the items, salaries, increments, supplements and planning days had been discussed with PCTA prior to the June 3rd school board meeting.
True, the Board has argued it was required by the Department of Education regulations, 30 days before the beginning of the school year, either to reduce salaries or if it took no action, to pay to all tenured teachers the next fiscal year a sum no less than the amount paid the preceding year. Those regulations had been in effect for some time prior to the June 3rd meeting and the Board was not suddenly confronted with the prospect that its operating budget for the next succeeding year might be less than the preceding year.
The Board was statutorily mandated by Sections 447.309(1) and 447.501(1)(c) to bargain collectively with the union's negotiator in good faith. The Board's expressed reason for not bargaining on the ground of its uncertain fiscal future cannot be excused. It was mandated by the Act to offer reasonable counterproposals. It was not required to acquiesce to the union's demands. Cf. NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952).
Compare NLRB v. Big Three Industries, Inc., supra, where the court upheld the NLRB's order that the employer had refused to bargain in good faith over the objection of the employer that during bargaining negotiations, the President of the United States instituted the wage and price freeze *125 of August 15, 1971. The Court observed that the freeze did not prevent the parties from bargaining or contracting for wage increases which might go into effect subsequent to the freeze.
If the Board was fearful that its revenue might be less the following school year than the 1974-75 year, it could have made a counterproposal consistent with the information it possessed. The Board finally made a counter offer on July 3, 1975, offering a 3% reduction as a temporary salary schedule. The Board could have easily made a tentative counterproposal before it initiated the cuts on June 3, 1975, in the very midst of bargaining. Its asserted argument that it acted in good faith is weakened by the subsequent actions of July 3, 1975, and July 28, 1975, when it offered a 3% cut as its best and final offer.
The Fifth Circuit Court of Appeals rejected a similar claim by an employer, an oil drilling company, that it was necessary to institute a unilateral action involving wage increases, holidays, vacations, etc., because of the urgency of the circumstances surrounding it. NLRB v. Hondo Drilling Co., N.S.L., 525 F.2d 864 (5th Cir.1976). The justification given by the company's negotiator was that because of the unusually dangerous aspects of a particular job at a certain rig, an incentive was needed to employ a sufficient number of men who would remain on the job until the well was completed. The Court held the employer's asserted good faith belief that the action was necessitated by the emergency nature of the situation did not excuse its failure to afford the union the opportunity to negotiate the matter. The Court concluded that "[w]hile negotiations need not be exhausted to the point of impasse, some discussion is required prior to changing a condition of employment... ." 525 F.2d at 867.
The Board's reliance on NLRB v. Minute Maid Corporation, 283 F.2d 705 (5th Cir.1960), is without merit. There the Court held the employer was not guilty of a failure to bargain collectively. Minute Maid is a processor and grower of oranges. During negotiations with the union, Minute Maid experienced the worst freeze since the beginning of the frozen concentrate industry. The Fifth Circuit excused Minute Maid from bargaining on economic matters when, at that time, the employer had no knowledge of the extent of the freeze damage and did not know it could use frozen fruit. There are obvious distinctions between the problems which confronted Minute Maid and those which confronted the School Board. Minute Maid's future income was dependent upon the harvesting of the endangered citrus crop. The School Board on the other hand was required to bargain on wages for the 1975-76 school year  a discrete event. Ms. Hall, the Board's financial analyst, admitted the 5% pay cut the Board adopted on June 3, 1975, for the coming school year had no effect on the balancing of the 1974-75 school budget.
The Board's reliance on NLRB v. Bradley Washfountain Co., 192 F.2d 144 (7th Cir.1951) is also not persuasive. The wage changes made there by the employer were made only after notice and negotiation with the union. An employer who in good faith negotiates with a union and makes offers to the union which the union rejects may then unilaterally initiate its proposals as the terms and conditions of employment without committing an unfair labor practice. NLRB v. Burns International Secur. Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).
Independent of any consideration whether substantial proof was presented that the Board's unilateral action was a refusal to bargain in good faith, we sustain PERC's conclusion that a subjective showing of bad faith was not necessary to find a violation of Section 447.501(1)(c), requiring that the parties bargain collectively. In National Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the employer, while negotiating with the union, had unilaterally granted merit pay increases, changed sick leave policy, and instituted a new system of automatic pay increases. The Court agreed with the NLRB that such unilateral action resulted in a frustration of collective bargaining as much as did a flat *126 refusal to bargain. It concluded that a subjective showing of bad faith is not necessary in order to find the employer had violated Section 8(a)(5) making it an unfair labor practice to refuse to bargain collectively.
We approve the following language from Katz and believe the principles there stated should apply with equal force to an unfair labor practice charge alleging a unilateral action in violation of Section 447.501(1)(c):
"The duty `to bargain collectively' enjoined by § 8(a)(5) is defined by § 8(d) as the duty to `meet . .. and confer in good faith with respect to wages, hours, and other terms and conditions of employment.' Clearly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate in fact  `to meet ... and confer'  about any of the mandatory subjects. A refusal to negotiate in fact as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5) though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." 369 U.S. 743, 82 S.Ct. at 1111. (Footnotes omitted.) (Emphasis in original.)

V. THE RELIANCE BY PERC UPON THE SPECIAL MASTER'S REPORT IN DETERMINING THE AMOUNT OF THE AWARD.
The Board complains it was prejudiced by PERC's reliance upon the special master's report, which was not introduced into evidence before the DOAH hearing officer, to support its conclusion the School Board did not have a sufficient bona fide financial emergency to justify its unilateral action. The special master was appointed pursuant to Section 447.03 to resolve an impasse resulting from the breakdown in bargaining between the parties. The report was not filed with the Commission until November 6, 1975, after all evidence had been submitted to the hearing officer. PERC should have relied only upon such evidence, and not evidence presented at a collateral proceeding. "Findings of fact [by the hearing officer] shall be based exclusively on the evidence of record and on matters officially recognized." Section 120.57(1)(b)7. Nevertheless, as we have previously observed, there was competent substantial evidence presented at the hearing which supported the hearing officer's determination that the Board had committed an unfair labor practice by refusing to bargain collectively as a result of its unilateral action freezing wages. The special master's report was merely cumulative to the evidence previously admitted before the hearing officer.
While we fail to find the Board was prejudiced by PERC's consideration of such cumulative evidence, the Commission should in the future scrupulously refrain from relying upon any evidence which is not appropriately before the hearing officer when formulating its final order.

VI. THE BACK PAY AWARD
Although we have remanded that portion of PERC's order sustaining the finding of an unfair labor practice as to the three discriminatees, we feel it appropriate to comment upon the Board's claim that PERC erred in not directing a hearing as to the amount of the back pay award, should on remand it be determined that the employer failed to meet its burden showing that the decisions not to rehire or promote would have been made anyway.
The hearing officer recommended the allegations in the complaint be sustained based upon the record before him. He suggested that since the record was not developed as to the award of back pay, reinstatement rights and other data which would be relevant prior to the issuance of an order *127 requiring the Board to make the discriminatees whole, the issue be determined at a later hearing to be held as expeditiously as possible after PERC made its final determination. PERC elected not to direct another hearing on such issues, but instead, without taking further testimony, ordered not only that Disabato and Rydzik be reinstated and Eckstein granted tenure but ordered them made whole for any loss of pay they may have suffered.
PERC's back pay award to discriminatees Rydzik and Disabato directed that they be made whole for any loss of earnings by paying them a sum equal to the amounts each would normally have received from the date of the expiration of their contracts until their reinstatement, "less any net earnings for the interim, with interest at six percent ... per annum." (Emphasis added.) The order by implication left the matter of other earnings received by the affected discriminatees during the interim to be resolved by the parties informally.[12] No doubt PERC was aware that in the private sector, the NLRB is required to mitigate the employer's damages by deducting from the discriminated employees' lost earnings, net earnings from other employment during the back pay period. NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). We believe that if a disputed issue of fact should arise as to the amount of earnings an employee may have received during the interim, PERC will devise an appropriate procedure to resolve any such possible controversy.
The petition for review is granted in part and denied in part. PERC's petition for enforcement of its order is granted as modified.
MILLS, Acting C.J. and SMITH, J., concur.
NOTES
[1] Unlike PERA, the National Labor Relations Act, 29 U.S.C. § 153 (d) (1970), grants specific authority to the General Counsel of the National Labor Relations Board to investigate charges, issue complaints and to prosecute such complaints. Moreover he serves not at the pleasure of the NLRB, but is appointed by the President for a term of four years.
[2] Making it an unfair labor practice for a public employer to interfere with, restrain or coerce "public employees in the exercise of any rights guaranteed them... ."
[3] Prohibiting a public employer from "[e]ncouraging or discouraging membership in any employee organization by discrimination in regard to hiring, tenure or other conditions of employment."
[4] No proof of anti-union motivation is needed under the NLRA if the discriminatory conduct is found to be inherently destructive of important employee rights. NLRB v. Great Dane Trailers, 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). "Some conduct is . . so `inherently destructive of employee interests' that it may be deemed proscribed without need for proof of an underlying improper motive." Ibid. at 33, 87 S.Ct. at 1797. "Such conduct bears its own indicia of intent..." NLRB v. Erie Resistor Corp., 373 U.S. 221, 231, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). "On the other hand, when the `resulting harm to employee rights is ... comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful,' and an affirmative showing of improper motivation must be made." NLRB v. Great Dane Trailers, supra, at 34, 87 S.Ct. at 1797. In either situation, however, once it has been proved the employer engaged in discriminatory conduct to some extent, "the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." Id. at 34, 87 S.Ct. at 1798.
[5] Preponderance of the evidence is the usual burden upon the charging party at agency proceedings; however depending upon the statute under which the claimant seeks relief, a greater burden may be imposed. Health & R.S. v. Career Serv. Comm., 289 So.2d 412, 415 (Fla. 4th DCA 1974).
[6] Mt. Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
[7] Mt. Healthy City Board of Ed. v. Doyle, supra. We also have this day adopted the above "but for" or "moving cause" test in Columbia County Board of Public Instruction v. PERC, 353 So.2d 127 (Fla. 1st DCA 1977). Cf. NLRB v. Ayer Lar Sanitarium, 436 F.2d 45, 50 (1970).
[8] Cf. Mt. Healthy City Board of Ed. v. Doyle, supra. The Doyle opinion referred to Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), in which the following balancing test was applied to the area of protected speech:

"It cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."
The test was stated in similar fashion by the Florida Supreme Court:
"A delicate balance must be struck in order that there be no denial of the guaranteed right of public employees to bargain collectively with public employers without, however, in any way trenching upon the prohibition against the public employees striking either directly or indirectly or using coercive or intimidating tactics in the collective bargaining process." Dade County Classroom Teacher's Asso'n., Inc. v. Ryan, 225 So.2d 903, 906 (Fla. 1969).
The United States Supreme Court has also applied such a test in determining whether unfair labor practices occurred under the NLRA on different occasions, e.g., NLRB v. Erie Resistor Corp., supra; NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). In Labor Board v. Erie Resistor Corp., supra, the Court stated at pages 228-229, 83 S.Ct. at pages 1145, 1146:
"As is not uncommon in human experience, such situations present a complex of motives and preferring one motive to another is in reality the far more delicate task, ... of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct."
[9] While Section 447.309(1) contains no similar statement, Section 447.203(14), defining collective bargaining, states in part, "neither party shall be compelled to agree to a proposal or be required to make a concession... ."
[10] The Pasco County School District, unlike other county school districts in the state, has adopted a 15-45 day year round class schedule whereby classes begin July 3, rather than in September and end on June 30.
[11] In fact however the anticipated deficit did not occur due to emergency measures taken by the Board, including the refinancing of school bus purchases and obtaining a large cash loan to provide cash for operating expenses. In fact there was approximately $4,000,000.00 more in funds available to the district in 1975-76 than the preceding year, owing in part to the transference of certain monies from the State Department of Education to the school district in February, 1976. There is no proof however from which it can be inferred that the Board could, at the time it reduced wages, have anticipated the surplus.
[12] The NLRB statements of procedure provide that after the NLRB's order has been issued, directing the payment of back pay, or after enforcement of such order has been made by the court, if informal efforts to dispose of the matter prove unsuccessful, a notice of hearing will be provided the parties, which may or may not include back pay specifications. The respondent is allowed to file an answer setting forth its defense. The issues will then be resolved at the hearing. 29 C.F.R. § 101.16 (1976). We note that PERC has formulated no similar rule.